303 F.Supp. 1240 (1969)
Rowland E. GANNON, Pastor of the St. Louis Cathedral Parish, et al., Plaintiffs,
v.
ACTION, a Voluntary and Unincorporated Association, Percy Green, Cecelia Goldman, William L. Matheus, Ivory Perry, Luther Mitchell and William Mitchell as Leaders and Agents of Action and Representatives of the Class of Members of Action, and Black Liberation Front, a Voluntary and Unincorporated Association, James H. Rollins, and Ocie Pastard, as individuals and as representatives of the Class of Members of Black Liberation Front, Defendants.
No. 69 C 225(2).
United States District Court E. D. Missouri, E. D.
September 5, 1969.
*1241 R. H. McRoberts, Veryl L. Riddle, Marion S. Francis, and Robert F. Scoular, Bryan, Cave, McPheeters & McRoberts, and Bernard J. Huger, St. Louis, Mo., for plaintiffs.
Robert B. Curtis, St. Louis, Mo., for Percy Green.
Murry A. Marks, Elliott & Marks, St. Louis, Mo., for Black Liberation Front, Ocie Pastard and James H. Rollins.

MEMORANDUM
MEREDITH, District Judge.
St. Louis Cathedral Parish is one of the parishes of the Archdiocese of St. Louis, which is one of the dioceses of the Roman Catholic Church. The church building of the St. Louis Cathedral Parish, known as the St. Louis Cathedral, is located in the City of St. Louis, Missouri, with legal title thereto vested in plaintiff John J. Carberry, Archbishop of St. Louis, as an official of the church and for and on behalf of members of *1242 the Roman Catholic Church and of said parish for their use and benefit. Plaintiff Rowland E. Gannon is the pastor of the St. Louis Cathedral Parish and plaintiffs Thomas R. Bolen, Peter P. Heinbecker, Arthur S. Littlefield, Mary Beth McKay, John K. Roedel, Jr., Betsy Thomas Birmingham, Helen Kane, Margaret B. O'Reilly, Joseph P. Houlihan, Charles Tintera, Charles Thatcher, John S. Johnson, Michael Grady, Joseph B. McDonald, Charles L. Boll, Thomas J. Mitchell, Jerome Bollato, John T. Byrne, and John W. Daake are parishioners of said parish and members of the Roman Catholic Church. Plaintiffs bring this action as individuals and as representatives of the members of said parish of said church. They fairly and adequately represent the members of the parish.
Defendant Action is a voluntary unincorporated association, which maintains headquarters at 4154 North Newstead in the City of St. Louis, Missouri. Members of Action constitute a class, many of whom use fictitious names and addresses and whose real identities and actual places of residence are unknown to plaintiffs. Defendants Percy Green, Cecelia Goldman, William L. Matheus, Ivory Perry, Luther Mitchell, and William Mitchell are leaders and agents of Action and fairly and adequately represent the class of the members of Action.
Defendant Black Liberation Front (hereinafter "Front") is a voluntary unincorporated association, which maintains headquarters at 4005-4007 Delmar Boulevard in the City of St. Louis, Missouri. Members of the Front constitute a class, many of whom use fictitious names and addresses and whose real identities and actual places of residence are unknown to plaintiffs. Defendants James H. Rollins and Ocie Pastard are leaders and agents of the Front and fairly and adequately represent the class of the members of the Front.
On Sunday, June 8, 1969, twenty-nine members of Action entered the Cathedral during the services. They marched down the center aisle and formed a line in front of the communion rail. Some were dressed in black Action sweatshirts, wearing black trousers and black berets, others were naked to the waist. One of the members of the group began to read from a paper. When it became obvious that he was not being heard, he was given an amplifier by one of the other members of his group. He then read the paper a second time while members of his group passed out copies to the congregation. The paper was a "notice", reading as follows:
"ACTION'S TO:
 NOTICE
THE PUBLIC ...................
THE LUTHERN CHURCHES, VIA PRESIDENT REV. DR. OLIVER HARMS
THE EPISCOPAL CHURCHES, VIA BISHOP GEORGE CADIGAN, and
THE ROMAN CATHOLIC CHURCHES, VIA CARDINAL JOHN CARBERRY.
Ladies and Gentlemen of the church, ACTION's `BLACK SUNDAYS', phase two, are series of protest demonstrations against the above church denominations. The demonstrations will last for a period of six months.
If you wish not to become involved, it would be best that you take a six month leave-of-absence from the church. ACTION's `BLACK SUNDAYS' at this church will take place without further warning. If you're present, of course, you'll become involved ____ a very shocking experience!
`BLACK SUNDAYS', phase two, will take on various forms of uniqueness, such as `spitting in the communion cup during communion service, a symbollic gesture of changing wine back to water and/or taking the holy bread from the Reverend and distributing it to the Black poor.

ACTION, an interracial human rights organization, which means our white members will be participating in all demonstrations, in all parts of the city and county.

*1243 ACTION DEMANDS:
1. ACTION demands that all properties, including slum property be made public.
2. ACTION demands that the property owner (the church superior staff) make itself available to act as a non-profit bonding agency for all Black residents of St. Louis.
3. ACTION demands that Harms, Cadigan and Carberry place all police officers of their respective religious jurisdiction, guilty of firing at Black fleeing suspects, wounding or killing a Black fleeing suspect, under disciplinary action of the church and make it public.

4. ACTION demands the removal of all investments from Laclede Gas, Union Electric, Southwestern Bell & McDonnell-Douglas Corp. These firms have consistently refised to hire and up-grade the Black man into the better paying jobs.
5. ACTION demands 75% of the `monies take', annually, to be relinquished to ACTION for the purpose of financing energetic community base programs that are actively combating white racism in other areas, regardless of creed.
6. ACTION demands that in support of public housing rent strikers, the Rev. John Shocklee be asked to resign his position from the St. Louis Housing Authority Board of Commissioners and that Harms, Cadigan & Carberry request a Black male rent strike tenant to be selected by the rent strike leaders to replace Father Shocklee.
ACTION'S `BLACK SUNDAYS' DEMONSTRATIONS WILL CEASE WHEN ALL DEMANDS ARE MET !!!!!"
At the conclusion of the list of demands, the demonstrators walked out of the church. At all times during the demonstration the members of Action inside the Church were in contact with defendant Percy Green and Major Gladney of the Action guerilla force by use of a walkie-talkie.
On Sunday, June 15, 1969, Action held another demonstration at the Cathedral. Defendant Green and several members of the Action guerilla force gathered across the street from the Cathedral. Several other members of Action went into the building. One of them, Mrs. Ernestine Lloyd, got up during the service, approached the lectern during the reading of a letter, and asked permission to speak for five minutes. Permission was denied, but she turned and began reading the paper to the congregation. She continued to read until the ushers removed the paper from her hands. The paper from which she read was a list of the six demands of Action which were passed out in the congregation. At the close of the service Mrs. Lloyd sat down in the vestibule of the church and refused to move, thereby necessitating her forceable removal by members of the St. Louis Metropolitan Police Force.
The next demonstration by Action took place on June 29, 1969, at the Cathedral. Some thirteen or fourteen young men accompanied the defendant Green to the Cathedral and approximately eight or nine went into the building. Defendant Green remained outside, but communicated with those on the inside by means of a walkie-talkie. Those who went inside went directly to the communion rail and sat down. They blocked the area where the service was to be held to such an extent that the service was cancelled.
On Sunday, July 6, 1969, defendant Green and about eighteen members of Action returned to the Cathedral. This group included Ivory Perry, Dr. Luther Mitchell, Major Cleric Gladney, and William Mitchell. They remained just outside the Cathedral while five of their number went inside. Green remained in contact with those on the inside by means of a walkie-talkie. Once inside, William Mitchell, dressed in a long black robe, wearing a triangular hat which resembled the bishop's mitre, walked to the front of the church carrying a *1244 sign with the wording: "Carberry makes a mockery of the real church." When he reached the communion rail, he turned and started walking toward the rear of the church, chanting "Racists, racists  white Christian racists." An altercation followed, and members of the St. Louis Police Force removed the demonstrators.
The plaintiffs have alleged jurisdiction under 42 U.S.C. §§ 1981, 1982, 1983, and 1985(3); 28 U.S.C. § 1343, and 18 U.S.C. § 241. Sections 42 U.S.C. §§ 1981-1985 are sometimes called the Reconstruction Civil Rights Acts. They were passed, along with companion criminal sections, in 1866, 1870, and 1871, to implement the newly ratified Thirteenth and Fourteenth Amendments to the Constitution. [For a discussion of the history of these sections, see: Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).] These sections were designed to prevent racial discrimination performed under color of state law or by groups, such as the Ku Klux Klan, operating entirely outside of the law. While it is obvious that these statutes were passed primarily to insure the rights of non-whites, nothing in the statutes limits their application to situations where the civil rights of non-whites are being violated. The statutes are phrased in terms such as "all persons" and "all citizens", and the courts are bound to give these sections "a sweep as broad as (their) language." Jones v. Alfred H. Mayer Co., 392 U.S. 409, 437, 88 S.Ct. 2186, 2202 (1968); United States v. Price, 383 U.S. 787, 810, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). These statutes have been interpreted to apply to discrimination against whites, as well as to discrimination against other races. Kentucky v. Powers, 139 F. 452 (Cir.Ct.E.D.Ky.1905). It is clear that these statutes apply to racial discrimination against all persons regardless of race.
The case of Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186 (1968), is a significant case in the development of these statutes. Until that case, the federal courts had exercised jurisdiction over only those cases in which plaintiffs were denied their constitutional rights by virtue of some state or local governmental action. Violations of these rights by private persons not acting under color of state law did not create a cause of action under these sections.
The Jones case held that:
"* * * it is clear that the Act was designed to do just what its terms suggest: to prohibit all racial discrimination, whether or not under color of law, with respect to the rights enumerated therein * * *" Id. at 436, 88 S.Ct. at 2201.
The Jones case deals with 42 U.S.C. § 1982. The holding and logic of that case should be applied to the other sections of the Civil Rights Act enacted at the same time. The history and purposes of these sections are so similar that any distinction would be artificial. In Dobbins v. Local 212, International Brotherhood of Electrical Workers, 292 F.Supp. 413 (S.D.Ohio 1968), suit was brought under 42 U.S.C. § 1981, with no allegation of state action. The Court held:
"At least since Jones v. Alfred H. Mayer Co., a strictly private right, be it in the property field as such, or the contract field as such, is within the protection of the Civil Rights Act of 1866 against interference by a private citizen or a group of citizens." Id. at 442.
It is the opinion of this Court that state action need not be alleged in order to state a cause of action under sections 1981, 1982, and 1985.
Plaintiffs have alleged violations of sections 1981 and 1982. Section 1981 states:
"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security *1245 of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."
Section 1982 provides:
"All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."
It is the opinion of the Court that Action and the other named defendants in this action have violated plaintiffs' rights guaranteed under these sections. They have interrupted the religious services at the Cathedral to such an extent that they have denied plaintiffs of their right to hold property and to have it protected as is guaranteed by the above-quoted sections. They have deprived plaintiffs of the right to use their property for religious services. Therefore, this Court has jurisdiction over this action under 28 U.S.C. § 1343(4).
Plaintiffs also allege violation of section 1983. That section is section 1 of the Ku Klux Klan Act of 1871, which was enacted pursuant to section 5 of the Fourteenth Amendment to enforce the provisions thereof. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Section 1983 states:
"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."
Section 1983, unlike sections 1981 and 1982, requires that the action for which redress is sought be under "color" of state law.
The clause "deprivation, under color of any state law" may also mean "deprivation, under color of any State constitution". Giles v. Harris, 189 U.S. 475, 23 S.Ct. 639, 47 L.Ed. 909 (1903). Article I, Section 5, of the Constitution of the State of Missouri, V.A.M.S., provides:
"That all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; that no human authority can control or interfere with the rights of conscience; that no person shall, on account of his religious persuasion or belief, * * be molested in his person or estate * * *"
Article I, Section 9, of the Missouri Constitution, guarantees "That the people have the right peaceably to assemble for their common good, * * *."
In this case, the defendants, not parishioners of the St. Louis Cathedral, entered, caused others acting in concert with them to enter, or threatened to enter the St. Louis Cathedral, purportedly pursuant to their state, and federal, constitutional rights of freedom of worship and peaceable assembly. However, the defendants, upon perpetration of their disruptive acts in the St. Louis Cathedral, exceeded whatever constitutional grant under which they purported to act and deprived plaintiffs of their constitutional rights of freedom of assembly, speech, and worship and to use and enjoy their property, all in violation of section 1983. Jurisdiction is, therefore, present under 28 U.S.C. § 1343(3) and (4).
A custom of usage of the State of Missouri, as well as of all the states, is the undisturbed worship by its citizens according to the dictates of their consciences. Defendants entered, caused others acting in concert with them to enter, or threatened to enter the St. Louis Cathedral under color of this custom or usage, then deprived plaintiffs of their constitutional rights of freedom of assembly, speech, and worship, and to use and enjoy their property, all in violation of section 1983. Jurisdiction *1246 is, therefore, present under 28 U.S.C. § 1343(3) and (4), for this reason also.
Plaintiffs also allege a violation of 42 U.S.C. § 1985(3). This section reads in part:
"If two or more persons in any State or Territory conspire or go * * on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; * * * in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any rights or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."
Essentially, this section prohibits a conspiracy to deprive a person or a class of persons of equal protection of the laws or equal privileges and immunities under the laws and of depriving the person or class of persons of having and exercising any right or privilege of a citizen of the United States. This section, unlike section 1983, does not specify that the wrongful action must be under color of law. The rationale of the Supreme Court's interpretation of section 1982 in Jones v. Alfred H. Mayer Co., supra, is applicable to the interpretation of section 1985(3). In Mayer, the Court looked to the plain and unambiguous terms of section 1982 and found absent any requirement of action under color of law.
Section 1985(3) is very similar to a criminal section of the civil rights acts, 18 U.S.C. § 241, which was enacted at about the same time. Section 241 reads in part:
"If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States * * *"
The purpose of this section is to impose criminal sanctions upon those who would conspire to deprive a person of the exercise of rights and privileges under the Constitution and laws of the United States. The similarity in language and history of these two sections makes cases arising under one useful in interpreting the other. It would appear that defendants have violated this federal criminal statute. On the issue of what rights are protected by section 241, the Supreme Court said:
"The language of § 241 is plain and unlimited. As we have discussed, its language embraces all of the rights and privileges secured to citizens by all of the Constitution and all of the laws of the United States. There is no indication in the language that the sweep of the section is confined to rights that are conferred by or `flow from' the Federal Government, as distinguished from those secured or confirmed or guaranteed by the Constitution." United States v. Price, 383 U.S. 787, 800, 86 S.Ct. 1152, 1160, 16 L.Ed. 2d 267 (1966).
Therefore, in order for plaintiffs to state a cause of action and for this Court to have jurisdiction, they must show a conspiracy and the violation of rights and privileges secured by the Constitution and laws of the United States.
It is the opinion of the Court that plaintiffs have shown a conspiracy and have made sufficient allegations to state a cause of action under section 1985(3). This Court has jurisdiction over this cause of action under sections 1985(3) and 28 U.S.C. § 1343(1).
It is the opinion of the Court that the evidence at the hearing on the preliminary injunction showed the existence *1247 of a conspiracy to deprive the members of the St. Louis Cathedral of their right to freedom of religion and worship as guaranteed by the Constitution of the United States. The conspiracy included Percy Green, Luther Mitchell, William Mitchell, Ivory Perry, Major Cleric Gladney, and the other members and leaders of Action. These conspirators acted in concert on the above-mentioned dates to disrupt the services at the St. Louis Cathedral. The use of the semi-military type uniforms, walkie-talkie equipment, and pre-printed lists of demands clearly shows the conspiracy. This conspiracy has adopted a plan of action called "Black Sundays, phase two". This plan contains a set of demands, including the handing over of seventy-five percent of the Cathedral's moneys to Action. It urges members of the church not to attend services. It warns of shocking demonstrations. The record of the hearing also indicates that the defendants Rollins, Pastard, and the Black Liberation Front knew of, took part in, and helped plan the concerted action on other churches in the area; that they and Action never went to the same church on the same Sunday. They are a part of the conspiracy. Therefore, Rollins, Pastard, and the Black Liberation Front will also be enjoined.
The defendants' demonstrations at the Cathedral were of such a nature that they effectively denied the plaintiffs their constitutionally-guaranteed right to freedom of worship. In Douglas v. City of Jeannette, 130 F.2d 652, 656 (3d Cir. 1942), the Court said:
"Freedom of worship, freedom of speech, freedom of the press, and the right of assembly are not the subject of direct constitutional grant. They are, however, constitutionally recognized and confirmed as attributes of liberty incident to all persons under the Constitution and laws of the United States regardless of their citizenship * * *."
In Jewish War Veterans of U. S. v. American Nazi Party, 260 F.Supp. 452 (N.D.Ill.1966), the Court enjoined the defendants from participating in very similar behavior.
Defendants appear to be in violation of 562.250 RSMo 1959, V.A.M.S. This statute makes disruption of religious services a misdemeanor. The purpose of this statute is to ensure religious freedom. This affirmative statement of the law of the State of Missouri establishes plaintiffs' right to peaceful religious services. It is the type of right mentioned in the above-discussed federal statutes. Because of the conspiracy between several organizations, and the great difficulty and burden involved in enforcing this statute under these circumstances, this Court will grant appropriate relief under the federal statutes.
The statutes speak of damages, however, injunctive relief is equally applicable in addition to damages. Brewer v. Hoxie School District No. 46, 238 F.2d 91 (8th Cir. 1956).
The question of the issuance of a preliminary injunction is one of discretion with the Court. Ohio Oil Co. v. Conway, 279 U.S. 813, 49 S.Ct. 256, 73 L.Ed. 972 (1929); Chicago B. & Q. R. v. Chicago Great Western R., 190 F.2d 361 (8th Cir. 1951); Missouri-Kansas-Texas R. v. Randolph, 182 F.2d 996 (8th Cir. 1950); United States v. Aluminum Co. of America, 247 F.Supp. 308 (E.D.Mo.1964), aff'd 382 U.S. 12, 86 S.Ct. 24, 15 L.Ed.2d 1 (1965). The court must take into consideration the respective injuries to the parties and the nature of the injury. If defendants are committing illegal acts, then it is unnecessary to weigh the injuries. See Youngstown Sheet & Tube Co. v. Sawyer, 103 F.Supp. 569, aff'd 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).
In summary, the defendants' actions appear to be illegal under both the federal and state criminal statutes. There is every indication that unless they are enjoined, the defendants will continue to disrupt the worship services of the plaintiffs and thereby deprive *1248 plaintiffs of their constitutional rights. Plaintiffs have suffered irreparable damage and have no adequate remedy at law, and if enjoined, the defendants will suffer no injury.
Accordingly, a preliminary injunction will be granted.

PRELIMINARY INJUNCTION
A memorandum dated this date is hereby incorporated in and made a part of this preliminary injunction.
The Court finds from the verified complaint and the evidence adduced at a hearing on the preliminary injunction that a preliminary injunction should issue because defendants will continue to disrupt, interrupt and disturb the worship services and meetings of the Cathedral parish of the Diocese of St. Louis, and will deprive the plaintiffs and parishioners of said parish of their Constitutional and civil rights to exercise freedom of religion, freedom of speech, freedom of assembly and the same right, as enjoyed by other citizens of the United States, to hold and use the parish property for religious purposes unless restrained by order of this Court and that immediate and irreparable injury, loss and damage will result to plaintiffs and parishioners of the Cathedral parish.
Now, therefore, it is ordered that the defendants and all other persons acting by, through or in their behalf, individually and collectively, and all other persons who have, may now or hereafter combine, conspire or act with them, or as individuals, be and they are hereby ordered to cease and desist until the 15th day of December, 1969, at 5:00 p. m., unless this order be dissolved prior thereto or extended, from:
a. Entering upon the premises of the St. Louis Cathedral at Lindell Boulevard and Newstead Avenue in the City of St. Louis, Missouri;
b. Participating in, authorizing, encouraging, inducing, permitting, engaging in or carrying out the disruption, interruption or disturbance of the worship services at said Cathedral or any meeting held on its premises;
c. Interfering or attempting to interfere directly or indirectly in any manner with the constitutional and civil rights of the plaintiffs and parishioners of said parish to exercise freedom of religion, freedom of speech, freedom of peaceable assembly, the right to use their parish property for religious purposes and not be deprived of the use thereof, and the civil right to worship God without disruption, interruption, disturbance, intimidation, oppression, and threats of extortion, injury and physical violence;
d. Threatening, inducing or endeavoring to induce plaintiffs or any members of said parish from attending services or meetings in said Cathedral;
e. Making any demands upon plaintiffs or members of said parish for money or for anything else;
f. Distributing or attempting to distribute to plaintiffs and the parishioners of said Cathedral, while on said Cathedral premises, copies of the "demands" of the Black Liberation Front, the Black Manifesto, or any other written or printed material of similar import;
g. Making any noise or commotion to disturb or disquiet any religious service or meeting at said Cathedral;
h. Preventing or attempting to prevent ingress and egress of the plaintiffs and parishioners of said parish to and from the Cathedral premises;
i. Doing any and all acts to injure, harass, threaten or intimidate the plaintiffs and other parishioners of said parish and visitors to said Cathedral, or in any way deprive them of the freedoms, rights, privileges, immunities and equal protection of the laws and their right to hold, enjoy and use their parish property as conferred upon them by Amendments I, V, IX and XIV to the Constitution of the United States and the statutes of the United States, Title 42 U.S.C. §§ 1981, 1982, 1983, and 1985(3) and Title 28 U.S.C. § 1343; and
*1249 j. Damaging, defacing or marring the Cathedral building and property of the plaintiffs.
It is further ordered that said defendants, and each of them, take all steps within their power to prevent the commencement or continuation of any and all of the aforesaid acts.
It is further ordered that the bond heretofore filed by the plaintiffs in the sum of $1,000.00 shall remain in full force and effect until further order of the Court.
It is further ordered that the 15th day of December, 1969, at 10:00 a. m., is fixed for the time and place of a final hearing in this cause, and the hearing on the preliminary injunction is consolidated with the hearing on the final injunction.