Dave VAN HOOMISSEN, Plaintiff,
and
Equal Employment Opportunity Commission, Plaintiff-Intervenor,

v.

XEROX CORPORATION et al.,
Defendants.

No. C–73–0423 OJC.

United States District Court,
N. D. California.

Dec. 19, 1973.

Thorne, Clopton, Herz, Stanek, San Jose, Cal., Howard C. Anawalt, Santa Clara, Cal., for plaintiff.

Chris Roggerson, Chester F. Relyea, June Wooliver Stahl, Carlos G. Ynostroza, San Francisco, Cal., for EEOC.

Brobeck, Phleger & Harrison, Richard Haas, San Francisco, Cal., for defendants.

## MEMORANDUM AND ORDER

OLIVER J. CARTER, Chief Judge.

Defendant Xerox and the nine individual defendants in this case have moved the Court to dismiss plaintiff's complaint and to strike each of its counts.

Plaintiff Van Hoomissen is suing defendants for various alleged acts of retaliation, to wit: denial of job advancement opportunities with the accompanying salary increases, demotion, and finally, termination of employment. The alleged retaliation was in response to plaintiff's asserted attempts to change the hiring policy of Xerox, which he believes discriminates against Mexican Americans at its Mountain View, California, plant. Plaintiff is seeking compensatory and punitive damages, in addition to back pay and reinstatement in an appropriate job position. He has been joined in the suit by the Equal Employment Opportunity Commission (hereinafter EEOC) as plaintiff-intervenor.[1]

Count One of plaintiff's complaint is based on § 703(a) of Title VII of the 1964 Civil Rights Act (42 U.S.C. § 2000e–2(a)). Count Two is based on 42 U.S.C. § 1981, while Count Three originally rested upon the Unruh Civil Rights Act of California (Calif. Civil Code §§ 51 and 52). Plaintiff has conceded that a cause of action under the Unruh Act cannot be maintained (see Alcorn v. Anbro Engineering, Inc., 2 Cal.3d 493, 86 Cal.Rptr. 88, 468 P.2d 216 (1972)), but now prays leave to amend his complaint to state a cause of action for intentional infliction of emotional distress under California law as a pendant state claim (Plaintiff's Opposition to Defendants' Motion to Dismiss, page 7, September 19, 1973).

## COUNT ONE

### A. The Jurisdictional Issue

The Court will first examine defendants' contentions as to Count One, plaintiff's alleged cause of action under Title VII. Defendants first claim that the Court lacks jurisdiction over the subject matter since plaintiff did not properly allege in his complaint that the California Fair Employment Practices Commission (FEPC) ever had jurisdiction over plaintiff's charge as required under 42 U.S.C. § 2000e–5(c). The statute also requires that the FEPC must terminate its proceedings on the complaint and refer the charge back to the EEOC before the EEOC can act on the charge.

It was agreed by counsel in oral argument that an amendment to the complaint alleging appropriate dismissal of the action by the FEPC would remedy this jurisdictional defect; such an amendment was made by plaintiff on November 10, 1973.[2] Therefore, the

---

1. Although plaintiff-intervenor EEOC is now appealing this Court's interlocutory order of September 10, 1973, which limited the EEOC's intervention to support of plaintiff Van Hoomissen's claims under 28 U.S.C. § 1292(a)(1), this Court still has jurisdiction over other matters in the case which are not on appeal. Phelan v. Taitano, 233 F.2d 117 (9th Cir. 1956); Janousek v. Doyle, 313 F.2d 916 (8th Cir. 1963); O'Brien v. Avco Corp., 309 F.Supp. 703 (S.D.N.Y.1969). Thus the Court can and will now decide the motions to dismiss and to strike.

2. The Amendment states in full: "Plaintiff's charge filed with the Equal Employment Opportunity Commission was duly deferred by that Commission to the California Fair Em-

Court now considers that it has jurisdiction of this count of plaintiff's complaint.

B. Discharge is Within the Scope of the EEOC Charge

Defendants' more important contention in regard to Count One is that the issue of Van Hoomissen's alleged discharge by Xerox is improperly before this Court. Defendants argue that, since the discharge itself was not mentioned in either charge lodged with the EEOC, it cannot be litigated here.

In his first charge to the EEOC dated August 3, 1971, plaintiff stated that he was being retaliated against for encouraging minority hiring at Xerox by the withholding of a sales bonus of $4794.00. Apparently this bonus was later paid, according to plaintiff's Complaint (XI(2)). Plaintiff also stated that he was attaching other papers to his charge outlining his allegations of retaliation by Xerox Corporation against him and the discrimination practiced by Xerox against Chicanos at the Mountain View plant.

Plaintiff did in fact attach to his charge part of a letter which he had sent to the President of the "BPG Division" of Xerox, a Mr. J. P. O'Neill, one of the named defendants herein. In that letter, plaintiff alleged that a Mr. Jim Noren, a branch manager, and also one of the individual defendants, "denied opportunities to me for personal growth" (i.e. promotional opportunities) because of plaintiff's efforts to boost minority hiring. Plaintiff also stated in that letter that he "was threatened with termination by management" because he attempted to seek "remedial action" in the matter of minority hiring (Charge of Discrimination and Attachments, Exhibits to Defendants' Motions to Dismiss and Strike, July 12, 1973).

On March 14, 1972, plaintiff filed another charge with the EEOC, stating

simply: "I believe I was retaliated against and am still subject to retaliation because I have protested discrimination and have filed a charge of discrimination. This was done to me by depriving me of my full salary compensation." (*Id.*) Plaintiff was then allegedly fired June 30, 1972.

Although the specific event of termination was not listed by plaintiff in either EEOC charge, plaintiff did state in his attached letter to the August 3 charge that he was "threatened with termination" and alleged continuing retaliation in the March 14 charge. The EEOC thus had notice of a potential continuing threat of termination.

In Oubichon v. North American Rockwell Corporation, 482 F.2d 569, 6 E.P.D. ¶ 8732 (9th Cir. 1973), the court held that "(w)hen an employee seeks judicial relief for incidents not listed in his original charge to the EEOC, the judicial complaint nevertheless may encompass any discrimination like or reasonably related to the allegations of the EEOC charge, including new acts occurring during the pendency of the charge before the EEOC." (p. 571).

The *Oubichon* court cites as authority a series of cases: Danner v. Phillips Petroleum, 447 F.2d 159 (5th Cir. 1971); Tipler v. E. I. du Pont de Nemours & Co., 443 F.2d 125 (6th Cir. 1971); Sanchez v. Standard Brands, Inc., 431 F.2d 455 (5th Cir. 1970); Sciaraffa v. Oxford Paper Co., 310 F.Supp. 891 (Me. 1970), and Taylor v. Safeway Stores, Inc., 333 F.Supp. 83 (Colo.1971). Defendant argues that "(n)o one of the cases cited in *Oubichon* either holds or even states that a plaintiff may litigate the lawfulness of a discharge which he has not referred to in a charge filed with EEOC" (Defendants' Reply, October 6, 1973, pages 5–6). That is a correct statement of the cases—as far as it goes. In each case the discharge *was* specifically mentioned in the EEOC

ployment Practices Commission. Upon termination of proceedings by the California Fair Employment Practices Commission, the

Equal Employment Opportunities Commission assumed jurisdiction of the Plaintiff's charge."

charge. However, the cited cases do not involve a challenge by defendants to the propriety of plaintiff's attempts to litigate his or her alleged *discharge* before the court. The question in each case is whether some claim *other* than the discharge is outside the scope of the original EEOC charge and thus not appropriate subject matter for litigation.

In Danner v. Phillips Petroleum, *supra,* the plaintiff alleged in her charge to the EEOC that she was discriminatorily fired. Her complaint, the court held, could properly encompass charges of discrimination in seniority and bidding rights as well. In Tipler v. E. I. du Pont de Nemours, *supra,* plaintiff was allowed to allege that his discharge was due to his active opposition to his employer's unlawful employment practices although he had simply alleged discriminatory firing in his EEOC charge. In Sanchez v. Standard Brands, Inc., *supra,* complainant's charge stated that she was harassed by her supervisor, who did not like Mexican or black women, and that she was discriminatorily fired. The court there held that her complaint properly included a claim that defendant had a policy of limiting both employment and promotion of all black and Mexican women. In Sciaraffa v. Oxford Paper Co., *supra,* women plaintiffs alleged they were discharged because of their sex when they filed with the EEOC. Their complaint before the court also alleged—properly, the court held—that there existed sex discrimination in seniority and promotion, which had in fact resulted in the subsequent discharges. In Taylor v. Safeway Stores, Inc., *supra,* the court held that plaintiff, who had complained to the EEOC that he was given inadequate training and supervision by Safeway and was terminated after 20 days due to his race, could properly represent a class of blacks and could request injunctive relief and back pay on their behalf.

Thus, the discharge in each case was *not* the issue in dispute; and in all cases plaintiffs were allowed to broaden the scope of their original EEOC charge to include issues *related to,* but not mentioned in, the original charge. Defendants' analysis of these cases, though factually accurate, is legally misleading.

In a number of other cases, e. g. Garneau v. Raytheon Co., 323 F.Supp. 391 (Mass.1971); Harkless v. Sweeny Independent School District, 427 F.2d 319 (5th Cir. 1970); Logan v. General Fireproofing Co., 309 F.Supp. 1096 (W.D.N.C.1969), similar extensions of the plaintiff's original EEOC charge have been allowed by the courts.

As was stated in the oft-cited case, King v. Georgia Power, 295 F.Supp. 943 (N.D.Ga.1968): "(A)llegations contained in the complaint of this suit may encompass any kind of discrimination like or related to allegations contained in the charge and growing out of such allegation during the pendency of the case before the Commission . . . (and) that range of issues that would have been the subject matter of the conciliation efforts between EEOC and the employer" (295 F.Supp. at 947).

Here, the Commission's investigation of plaintiff's claims of retaliation as outlined in his charges and attachments filed with the EEOC would have led it to examine an alleged potentially varied series of efforts by Xerox to retaliate against plaintiff caused by plaintiff's efforts to boost minority hiring. The retaliation charged by plaintiff was continuous; dismissal of plaintiff should be viewed as the final link in the chain of retaliation alleged by plaintiff.

■ Courts construing Title VII suits have been reluctant to allow procedural technicalities of pleading to ban potentially just claims. "Consequently, courts confronted with procedural ambiguities in the statutory framework have, with virtual unanimity, resolved them in favor of the complaining party" (Sanchez v. Standard Brands, Inc., *supra,* 431 F.2d, at 461).

■ Therefore, the subject of plaintiff's alleged discharge by Xerox is properly within the scope of his two EEOC charges, which claimed continu-

ous retaliation by defendant Xerox and members of its management staff resulting in, among other things, loss of pay and loss of promotion.

### C. The Individual Defendants

In plaintiff's complaint, in addition to defendant Xerox, plaintiff names nine individual defendants. All defendants have moved to dismiss the nine individuals from the suit on the ground that none were named by Van Hoomissen in the two charges he filed with the EEOC. The appropriate statute provides, once a charge is made against an employer, that the employer shall be served a notice of the charge by the EEOC and that the EEOC shall make an investigation thereof (42 U.S.C. § 2000e–5(b)). 42 U.S.C. § 2000e–5(f)(1) then provides that, within the appropriate time period and after the necessary administrative procedures have been followed, "a civil action may be brought against the respondent named in the charge . . . ." The question here is whether 42 U.S.C. § 2000e–5(f)(1) should be narrowly interpreted or liberally construed, and if liberally construed, the minimum boundaries that should be imposed.

As was described in the section above, two of the individual defendants, O'Neill and Noren, were named in *attachments* to the first EEOC charge filed by plaintiff. On the one page charge form itself, in answer to the question: "Who discriminated against you?", plaintiff listed only "Xerox Corporation." However, under "Explain what unfair thing was done to you," plaintiff summarized the attachments, pages of a letter to O'Neill in which Noren's name prominently figured.

■ The courts, as noted above, have generally attempted to construe Title VII in a liberal fashion. In view of this trend, it seems to the Court that the charge and its attachments should be considered as a unit by the Court when determining the proper defendants in this matter.

Case law on the specific point here under discussion is scarce; neither plaintiff's nor defendants' citations are helpful. The court in Bowe v. Colgate-Palmolive, 416 F.2d 711 (7th Cir. 1969) constructed what is perhaps the most helpful, although admittedly sketchy, legal framework concerning the question of adding defendants not named in an EEOC charge to a Title VII suit: "It is a jurisdictional prerequisite to the filing of a suit under Title VII that a charge be filed with the EEOC against the party sought to be sued. This provision serves two important purposes. First, it notifies the charged party of the asserted violation. Secondly, it brings the charged party before the EEOC . . . ." (at 719). The practical question left open by the *Bowe* court is how strictly form must be adhered to when filing an EEOC charge. Must the plaintiff, in order to properly file the charge against the party sought to be sued, place the appropriate answer after the correct question on the one page charge sheet, or is some deviation from form allowed as long as the charging party includes all necessary facts in a way that is intelligible and meaningful to the EEOC?

Here, once again, the *Sanchez* court is helpful in spotlighting the issue: ". . . the crucial element of a charge of discrimination is the *factual* statement contained therein. Everything else entered on the form is, in essence, a mere amplification of the factual allegations . . . In the context of a statute like Title VII it is inconceivable that a charging party's rights should be cut off merely because he fails to articulate correctly the legal conclusions emanating from his factual allegations" (431 F.2d at 462).

The plaintiff in the case at bar, a layman, may have assumed that his answer to the question "Who discriminated against you?"—"Xerox Corporation"— would encompass those employees of Xerox whom he mentions by name in his attachments to the charge. (Plaintiff

should not have assumed, however, that the blanket accusation against Xerox would enable him subsequently to sue other employees of Xerox whom he had never named in those papers filed with the EEOC.) Plaintiff's factual allegations regarding O'Neill and Noren seem sufficiently complete to bring them to the EEOC's attention as possible Title VII violators upon its reading the charge and attachments. Thus, the two legal requirements set up by the *Bowe* court should, in theory, have been fulfilled in the instant case: 1) by his factual allegations contained in the Explanation and attachments, plaintiff notified the EEOC of his charges against O'Neill and Noren; 2) if the EEOC properly investigated the allegations made by plaintiff in his first charge, O'Neill and Noren should have been given notice of the investigation and of the alleged charges pertaining to them.

Whether in fact the EEOC did investigate the charges against both men and so notify them is an evidentiary question which can be resolved at the time of trial. If O'Neill and Noren are then able to demonstrate that no such investigation was made, and thus no notice was given prior to the serving of the court suit upon them, they may at that time move again for their dismissal from the case.

However, the Court agrees with defendants that the seven other individuals are not proper parties in this suit. According to plaintiff's complaint all hold posts with Xerox Corporation; Mr. McColough is Chairman of the Executive Committee; Mr. La Hue is Western Regional Manager; Mr. Hurley is a San Francisco Branch Manager; Mr. Judd is now a San Jose Branch Manager; Mr. Erickson and Mr. Sutter are Area Sales Managers, and Mr. Weinrich is an "employee". None of these people seem to be immediately connected with the Mountain View Branch; even if they are, the Court can find no reference to them individually anywhere in plaintiff's two charges or attachments. The Court does not feel that the liberality with which it may construe 42 U.S.C. § 2000e–5(f)(1) stretches so far as to include as defendants in this suit seven persons whose only visible common denominator appears to be their employer —Xerox. Without any further indication by plaintiff as to some other connection between himself and the seven defendants in terms of this suit, it seems inappropriate in this instance to retain jurisdiction over the suit, as suggested by the parties, and to hold it in abeyance while plaintiff gives proper notice to the EEOC. Therefore, the seven defendants—McColough, La Hue, Hurley, Judd, Erickson, Sutter and Weinrich will be dismissed from the case with prejudice.

### D. The Question of Damages

Defendants have challenged plaintiff's claim for compensatory and exemplary damages as inappropriate under Title VII. Plaintiff estimates his compensatory (or special) damages at $967,000 and his damages for pain and suffering at $100,000. He prays for relief in the sum of $926,516 compensatory damages and asks for $2,000,000 in punitive damages.

The relevant section of Title VII, 42 U.S.C. § 2000e–5(g) (inclusive of the 1972 amendment), reads:

"If the court finds that respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . *or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings*

. . . *shall operate to reduce the back pay otherwise allowable.*" [3]

The question of the propriety of punitive and compensatory damages in Title VII cases has only recently arisen in the courts, and the results have been mixed.[4]

Some courts have held that punitive damages are an appropriate form of relief in a Title VII case, e. g. Tooles v. Kellogg, 336 F.Supp. 14 (Neb.1972) (court struck claim for compensatory relief but allowed claim for punitive damages to be retained).

Compensatory damages have also been allowed, e. g. Tidwell v. American Oil Co., 332 F.Supp. 424 (Utah 1971) (plaintiff allowed 6% interest on back wages and contributions defendant would have made to group life insurance plan and company savings); Rosen v. Public Service Electric and Gas Co., 477 F.2d 90 (3rd Cir. 1973) (male employees who received reduced retirement benefits where women in the same position were awarded full benefits received the difference).

Other cases have refused to award any monetary damages other than back pay on the theory that the statute speaks of back pay only as an additional and limited remedy to equitable relief, e. g. Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122 (5th Cir. 1969) ("The demand for back pay is not in the nature of a claim for damages, but rather is an integral part of the statutory equitable remedy", 417 F.2d at 1125).[5]

After examining the lengthy legislative history of Title VII, in addition to the briefer history surrounding the 1972 amendments, this Court finds that Congress, when it drew up that part of the statute dealing with remedies for unlawful employment practices, had in mind a wide panorama of equitable tools that courts might use but did not intend that courts would punish defendants by imposing upon them large money awards in the form of compensatory or punitive damages.

Although the 1964 discussion in Congress regarding Section 2000e–5(g) is not terribly illuminating, it does seem apparent from a reading of the Congressional debates and the legislative record that the main purpose of Title VII as seen by its proponents was to "seek to give people an opportunity to be hired on the basis of merit" (remarks by Senator Humphrey in introducing the Civil Rights Bill for debate in the Senate on March 30, 1964, 110 Cong.Rec. 6549). According to the House Report on the Bill, "(t)he purpose of this title is to eliminate, through the utilization of formal and informal remedial procedures, discrimination in employment" (House Report No. 914, 1964 U.S.Code Cong. and Admin.News 1964, p. 2401). Additional members of the House Committee which wrote that Report referred to the Commission, the administrative body which would in large part carry out the purpose of the Title, as an agency which would work in a corrective, not a punitive, manner: "It must . . . be stressed that the Commission must confine its activities to correcting abuse, not promoting equality with mathematical certainty . . . Its primary task is to make certain that the channels of

---

3. Italics indicates words added by the 1972 amendment, 86 Stat. 106.

4. District courts have original jurisdiction in damage suits arising under any federal civil rights act; see 28 U.S.C. § 1343(4) and Agnew v. City of Compton, 239 F.2d 226 (9th Cir. 1956), *infra.*

5. Punitive damages have historically been granted only in a legal action, not one in equity. A court sitting in equity cannot award incidental damages (Decorative Stone Co. v. Building Trades Council, 23 F.2d 426 (2d Cir. 1928) and citations contained therein) and, absent an express statutory authorization, a court dealing in equity cannot award exemplary damages (Swofford v. B. and W. Inc., 336 F.2d 406 (5th Cir. 1964), cert. denied 379 U.S. 962, 85 S.Ct. 653, 13 L.Ed.2d 557). No such express authorization is present in the statute under consideration although it speaks almost exclusively in equitable terms. Punitive damages, therefore, would not seem to be within the court's power to award in Title VII cases, yet a number of courts have seemingly found such power; see the citation *supra,* page 836.

employment are open to persons regardless of their race" (*Id.* at p. 2516).

Again in 1972, when the amendment giving the Commission power to go into court on its own was being debated, the Title was again referred to primarily as a tool to ensure that opportunities for employment were in fact equal: it was not described as a punitive measure against those who frustrated equal employment. "Most people just want to work. That is all . . . We are trying to see that all of us, no matter what race, sex, or religious or ethnic background, will have an equal opportunity in employment" (Representative Dent, 118 Cong.Rec. 1866–67, March 8, 1972).

In that 1972 debate, the concerns of Congress in amending 42 U.S.C. § 2000e–5(g) revolved around the specific terms of the one money remedy allowed under the act—back pay. One Report makes note that, in debating the amendment to § 2000e–5(g), the Senate had suggested that back pay be accruable not longer than two years prior to filing with the Commission; the House had argued for two years prior to filing with the court. The Senate prevailed (Joint Explanation Statement of Managers . . ., 1972 U.S.Code Cong. and Admin.News 1972, p. 2183).

The Senate analysis of the 1972 amendment to § 2000e–5(g) accurately reflects the current sense of unease and uncertainty over the use of punitive damages in Title VII cases:

"The provisions of this subsection are intended to give the courts wide discretion exercising their equitable powers to fashion the most complete relief possible. In dealing with the present section 706(g) the courts have stressed that the scope of relief . . . is intended to make the victims of unlawful discrimination whole . . . (and restore them) to a position where they would have been were it not for the unlawful discrimination." (118 Cong.Rec. 3462).

. In one breath the Senators note that the equitable powers given to the courts are extremely broad; in the next they speak rather imprecisely of making a person "whole". What is intended by that second goal? The problem mirrored here has been a source of confusion among the district courts.

However, in addition to the general legislative history which indicates that the remedies intended were those provided for in § 2000e–5(g), there are further factors which lead this Court to believe that Congress meant what it said in § 2000e–5(g) and that it meant no more.

The provisions of § 2000e–5(g) of Title VII are modeled closely upon the National Labor Relations Act, 29 U.S.C. §§ 160(b) and 160(c). In 29 U.S.C. 160(c), the remedies provided for are "affirmative action, including reinstatement of employees, with or without back pay." Punitive damages cannot, and have not been, awarded under this Act (Consolidated Edison Co. v. NLRB, 305 U.S. 197, 235–236, 59 S.Ct. 206, 219, 83 L.Ed. 126 (1938)). Neither have compensatory damages, aside from back pay, been allowed.

In explaining and introducing the Civil Rivhts Bill, Senator Humphrey in his address and Senators Clark and Case as Floor Managers refer to the fact that the relief under Title VII is similar to that available under the National Labor Relations Act (110 Cong.Rec. 6549, and 110 Cong.Rec. 7214). Although not conclusive, the similarity of the two statutes and the fact that Congress was aware that neither punitive nor compensatory damages were allowed under the National Labor Relations Act leads to the firm belief that Congress did not intend that any money damages other than back-pay would be granted under the present statute.

Perhaps even more illuminating on the question of the scope of damages in Title VII is the fact that Title VIII, which deals with fair housing and is part of the 1968 Civil Rights Act, specifically provides for punitive damages (in the maximum amount of $1000) (82 Stat. 88, April 11, 1968, 42 U.S.C. §

3612). When the 1972 amendment was made to Title VII, Title VIII was already law, yet no such parallel provision for punitive damages was included, even though *other amendments* to the remedies section were made. No reference has been made in either the Title VII or the Title VIII statutes to compensatory damages.

Plaintiff argues that in several instances courts have awarded punitive damages where none were authorized by statute upon finding that such damages effectuate the purpose of the statute, e.g. Wills v. Trans World Airlines, Inc., 200 F.Supp. 360 (S.D.Cal.1961) and Lee v. Southern Home Sites Corporation, 429 F.2d 290 (5th Cir. 1970). Plaintiff suggests that Title VII is an appropriate statute to enforce by use of punitive damages.

However, in the majority of cases where such relief was given (usually in 42 U.S.C. §§ 1982 and 1983 cases), the rationale has been that, where the statute speaks only in the most general of remedial terms, or in no terms at all, the federal common law allows the court to award punitive damages if such award carries forth the purpose of the statute. In the present case, however, we have a statute which is quite specific in the remedies it provides. This Court believes it would be beyond the scope of its power to find other remedies contained in that statute where none seemingly exists.

■ Therefore, the Court will strike from the complaint plaintiff's prayers for both compensatory and punitive damages on the ground that such relief is not provided for under Section 2000e–5(g) of Title VII.

## COUNT TWO

### A. Can Plaintiff sue under 42 U.S.C. § 1981?

Count Two of the complaint is based upon Section 1981 of the 1866 Civil Rights Act, which states that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . ." Defendants move to strike this Count from the complaint.

Plaintiff and plaintiff-intervenor EEOC argue at length that plaintiff, a white male who is alleging retaliation by his employer because of plaintiff's attempts to encourage minority hiring by that employer, should be able to sue under Section 1981. This section has frequently been applied to acts of private racial discrimination in employment (Macklin v. Spector Freight Systems, Inc., 156 U.S.App.D.C. 69, 478 F.2d 979 (1973) and citations contained therein).

In the last few years, a goodly number of legal pages have been devoted to arguing the validity of a white person's standing to sue under Section 1981. Many cases hold that a white plaintiff cannot bring suit under Section 1981 because, in fact, he has not usually suffered any detriment *due to his race*. Tramble v. Converters Ink. Co., 343 F.Supp. 1350 (N.D.Ill.1973); League of Academic Women v. Regents of the University of California, 343 F.Supp. 636 (N.D.Cal.1972); Williams v. San Francisco Unified School District, 340 F.Supp. 438 (N.D.Cal.1972); Marshall v. Plumbers and Steamfitters Local Union 60, 343 F.Supp. 70 (E.D.La.1972). Other cases have held further that a white person can *never* have standing to sue under Section 1981 since the section was designed to protect non-whites only. Ripp v. Dobbs Houses, Inc., 366 F.Supp. 205 (N.Ala.1973); Perkins v. Banster, 190 F.Supp. 98 (D.Maryland 1960), affirmed, 285 F.2d 426 (4th Cir. 1960)

Only in a few cases have whites actually been permitted to bring an action under Section 1981; the two most frequently cited cases are Central Presbyterian Church v. Black Liberation Front, 303 F.Supp. 894 (E.D.Mo.1969) and Gannon v. Action, 303 F.Supp. 1240 (E.D.Mo.1969). In both these cases, how-

ever the court allowed suit under Section 1981 because of the alleged infringement upon white plaintiffs' property rights;[6] these were not employment discrimination cases.

The opinion of Judge Peckham in N. O. W. v. Bank of California, 5 E.P.D. ¶ 8510 (N.D.Cal.1973) provides a close parallel to this case and is helpful in resolving the issue. There plaintiff, a white male, was allegedly fired solely because he "sought to affect the participation of the Bank in the racially discriminatory practices of the Jonathan Club" (at 7442). Although attracted by what he termed the "better view"—to read Section 1981 as broadly as possible— Judge Peckham decided that he must adhere to the Ninth Circuit's unrepudiated holding in Agnew v. City of Compton, 239 F.2d 226 (9th Cir. 1956), cert. denied 353 U.S. 959, 77 S.Ct. 868, 1 L.Ed. 2d 910, that Section 1981 can only be sued upon when "appellant was deprived of any right which, under similar circumstances, would have been accorded a person of a different race" (*supra* at 230). Thus Judge Peckham held that the Court cannot allow a white plaintiff standing under Section 1981 when he has suffered a deprivation which was not the result of his race. This Court feels equally obliged to follow the reasoning put forth by Judge Peckham in this matter.

In the present suit, the "better view" referred to by Judge Peckham is vigorously asserted by plaintiff and plaintiff-intervenor as a basis for granting plaintiff standing in this suit. They argue that the line of cases which deal with Section 1982 of the 1866 Civil Rights Act and allow white plaintiffs standing to sue should be expanded to encompass Section 1981. In three leading cases, Sullivan v. Little Hunting Park, 396 U.S. 229, 90 S.Ct. 400, 24 L. Ed.2d 386 (1968), Jones v. Alfred H.

Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) and Walker v. Pointer, 304 F.Supp. 56 (D.C.1969), white persons who alleged interference with their *own* property rights as the result of discrimination against black persons were allowed standing under Section 1982.

The Ninth Circuit in Trafficante v. Metropolitan Life Insurance Co., 446 F. 2d 1158 (9th Cir. 1971) approved this line of cases by positing a general thesis that, when a white person suffers some "racially motivated interference with his property rights," he has standing to sue under Section 1982. When the *Trafficante* decision was appealed to the Supreme Court, the Court in a footnote expressly reserved any ruling on the question of standing under Section 1982 (409 U.S. 205, at 209, n. 8, 93 S.Ct. 364, 34 L.Ed. 415 at 419, n. 8 (1973).

If a white person has standing to sue under Section 1982 when he suffers interference to his property rights due to racially motivated conduct (the *Trafficante* formula), should that right be expanded to include the companion statute, Section 1981, when a plaintiff suffers a direct injury to his *employment* as a result of racially motivated conduct? Most courts have refused to so expand the concept (see text and citations above at page 838) and, as noted above, in the two cases which *have* allowed white persons standing under 1981, that standing was really predicated upon the interference by defendants with plaintiffs' *property* rights, not with their employment.

■ Therefore, as a result of the analysis *supra*, this Court does not believe it should expand the *Trafficante* formula to allow plaintiff standing under Section 1981. The Supreme Court's refusal to review the *Trafficante* holding on this point indicates to this Court that the matter should be left in *status*

---

6. "Defendant have prevented plaintiffs from the right guaranteed by this section to equal benefit of laws for the security of property." (Central Presbyterian Church, supra, 303 F.Supp., at 901). ". . . they have denied plaintiffs of their right to hold property and have it protected . . ." (Gannon v. Action, supra, 303 F.Supp., at 1245).

*quo* until further word from the Supreme Court is heard on this most difficult issue. Thus the Court holds that plaintiff, a white male, has no standing to sue under Section 1981, and that Count Two must be stricken from the complaint.[7]

## COUNT THREE

 Plaintiff has asked leave to amend Count Three to add a claim for intentional infliction of emotional distress under California law as a pendant claim, rather than alleging a cause of action under the Unruh Act. Although the Court has the power to hear a pendant state claim, it also has the discretion to refuse to hear it if it believes that sufficient reasons (such as possible jury confusion or variance in the scope of the issues) militate against joining a state claim to the federal cause of action (United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). Since the Court has stricken plaintiff's claims for punitive damages under Count One, the Court feels that it would be inconsistent with, and beyond the scope of, plaintiff's claim under Title VII to allow plaintiff to litigate the question of punitive damages by amending his complaint to bring in a state claim. Consequently, the Court will refuse to allow plaintiff to amend his third cause of action to add a pendant state claim for intentional infliction of emotional distress.

Accordingly, it is ordered that defendants' motion to strike the subject of plaintiff's discharge from the complaint be, and hereby is, denied;

It is further ordered that defendants' motions to dismiss defendants O'Neill and Noren are, and each of them is, hereby denied; while defendants' motions to dismiss defendants McColough, La Hue, Hurley, Judd, Erickson, Sutter and Weinrich are, and each of them is, hereby granted with prejudice, and the action is hereby dismissed with prejudice as to each and all of the seven above-named defendants;

It is further ordered that defendants' motion to strike plaintiff's claims for compensatory and punitive damages under Count One be, and hereby is, granted, and the allegations and claims set forth in paragraphs XVI, XVII, XVIII, and parts F and G of XXVI are hereby stricken from the complaint;

It is further ordered that defendants' motions to strike Count Two, wherein plaintiff alleges a cause of action under 42 U.S.C. § 1981 be, and hereby is, granted, and Count Two is hereby stricken from the complaint;

It is further ordered that leave to amend Count Three by plaintiff be, and hereby is, denied, and Count Three is hereby stricken from the complaint.

---

7. We do not need to reach the question of whether or not Mexican-Americans should be considered "non-white" for the purposes of 1981, since there are no Mexican-American plaintiffs in the suit.